1
2
3
4
5
6
7

> **FILED**
>
> APR 0 5 2016
>
> CLERK, U.S. DISTRICT COURT
> SOUTHERN DISTRICT OF CALIFORNIA
> BY _____ DEPUTY

8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

OSWALDO ENRIQUE TOBAR, et al.,

CASE NO. 07cv817-WQH-JLB

11

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

12

Plaintiff,

v.

13

UNITED STATES OF AMERICA,

14

Defendant.

15

HAYES, Judge:

16

The matter before the Court is the Findings of Fact and Conclusions of Law

17

pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and Plaintiffs'

18

Emergency Rule 37 and Rule 26(b) Motion or in the Alternative Plaintiffs' Motion for

19

a Continuance (ECF No. 207).

20

## I.   Background

21

On May 4, 2007, Plaintiffs[1] initiated this action by filing a Complaint against

22

Defendant, the United States. (ECF No. 1). On February 5, 2008, Plaintiffs filed a

23

24
25
26
27
28

---

[1] The named Plaintiffs are: Oswaldo Enrique Tobar, Rosa Carmelina Zambrano Lucas, Junior Ivan Pico Alava, Segundo Matias Zambrano Alonzo, Francisco Gabriel Yole Arteago, Fausto Lupercio Arias Castaneda, Frabricio Bayron Cedeno, Joffre Johnny Cedeno Cedeno, Lindon Cleofe Cedeno Cedeno, Ramon Eliades Ramon Velez Cedeno, Daniel David Quimi Chalen, Pablo Eduardo Lucas Conforme, Ramon Eduardo Pilligua Conforme, Ciro Mariano Lopez Mero, Pedro Manuel Lopez Mero, Jose Eduardo Lucas Mero, Luis Antonio Penafiel Mero, Pedro Jose Reyes Mero, Telmo Arcadio Chica Obando, Luis Miguel Cedeno Pico, Jaime Gustavo Palma Pinargote, Yardy Klever Flores Segovia, Pacho Hernandez Solorzano, Carlos Wilfrido Veliz Velez, Carlos Orlando Velez Zambrano, and Jose Luis Zambrano.

First Amended Complaint. (ECF No. 28).  The Complaint alleged that on October 5, 2005, in international waters off the coast of Ecuador, the United States Coast Guard "unlawfully and negligently stopped, searched, arrested, detained and imprisoned the Plaintiffs, seized the boat [and] destroyed the cargo and fish owned by [Plaintiffs]." *Id.* at 3.  The Complaint alleged that this incident arose out of suspicion that Plaintiffs were "smuggling and possessing illegal drugs." *Id.*  The Complaint alleged that "[n]o charges were ever subsequently brought against any Plaintiff." *Id.*  The First Amended Complaint asserted that subject matter jurisdiction exists pursuant to: (1) the Public Vessels Act ("PVA"), 46 U.S.C. §§ 31101-31113; (2) the Suits in Admiralty Act, 46 U.S.C. §§ 30901-30918 ("SAA"); (3) the Alien Tort Statute, 28 U.S.C. § 1350; (4) the Convention on the Law of the Sea; (5) the International Covenant on Civil and Political Rights ("ICCPR"); and (6) a bilateral treaty between Ecuador and the United States concerning the use of an Air Force base at Manta, Ecuador.

On June 5, 2008, the United States filed a Motion to Dismiss for lack of subject matter jurisdiction on the ground that the United States had not waived sovereign immunity.  (ECF No. 31).  Defendant asserted that the PVA is the sole waiver of sovereign immunity with respect to Plaintiffs' action; that the PVA is subject to the same discretionary function exception to the limited waiver of sovereign immunity included in the SSA; and that the law of the case established that discretionary function exception is a bar to the waiver of sovereign immunity in this case.

On September 19, 2008, this Court dismissed the First Amended Complaint for lack of subject matter jurisdiction. (ECF No. 57).  The Court concluded that the Alien Tort Act, the Convention on the Law of the Sea, the ICCPR, and the Manta Agreement were not valid bases for subject matter jurisdiction. *Id.* at 9-12.  The Court concluded "that the SAA is not a valid basis for subject matter jurisdiction because the discretionary function exception to the United States' waiver of sovereign immunity under the SAA applies, retaining the sovereign immunity of the United States under the SAA." (ECF No. 57 at 7).  The Court concluded "that the PVA is not a valid basis for

1    subject matter jurisdiction because Plaintiffs have not demonstrated reciprocity, which

2    is a jurisdictional prerequisite to the wavier of sovereign immunity under the PVA."

3    *Id.* at 9.

4        On October 22, 2008, Plaintiffs filed a notice of appeal from the order dismissing

5    the First Amended Complaint for lack of subject matter jurisdiction. (ECF No. 59). On

6    April 21, 2011, the Court of Appeals for the Ninth Circuit issued an order affirming in

7    part, vacating in part, and remanding.  The Court of Appeals affirmed this Court's

8    Order that the Alien Tort Statute, the Convention on the Law of the Sea, the ICCPR,

9    and the bilateral treaty concerning the use of an Air Force base at Manta, Ecuador did

10   not waive sovereign immunity. *Tobar v. U.S.*, 639 F.3d 1191 (2011) ("*Tobar I*").  The

11   Court of Appeals concluded that the Military Claims Act did not waive sovereign

12   immunity.  *Id.* at 1196.  With regards to the PVA, the Court of Appeals stated, "if a

13   claim falls within the scope of the PVA, the plaintiff *must* meet the reciprocity

14   requirement of the PVA, regardless of the type of claim the plaintiff asserts—PVA,

15   SAA, or FTCA."  *Id.* at 1197.  The Court of Appeals stated that the PVA contains the

16   following reciprocity requirement: "A national of a foreign country may sue under the

17   PVA only if the government of that foreign country would permit a United States

18   national to bring the same suit in its courts."  *Id.* at 1196.  The Court of Appeals stated,

19
20       Here, the district court held that, because Plaintiffs' documents did not
         establish reciprocity, Plaintiffs failed to meet their burden of
21       demonstrating reciprocity. We are uncertain whether a plaintiff bears the
         burden of establishing the content of foreign law for purposes of the
22       PVA's reciprocity requirement . . . . . But even assuming that Plaintiffs
         bear the burden here, the district court apparently did not recognize that,
23       in its discretion, it could inquire further into the content of Ecuadorian
         law.  We therefore vacate and remand.
24
25       Whether reciprocity exists under Ecuadorian law remains undetermined
         . . . . On remand, the court may instruct the parties to provide additional
26       evidence, through testimony or other means; the court may conduct its
         own research; and the court may undertake any other inquiry consistent
27       with [Federal Rule of Civil Procedure] 44.1 to determine whether
         reciprocity exists under Ecuadorian law.
28

1    *Id.* at 1200.  The Court of Appeals remanded the case.

2         On March 13, 2012, this Court issued an order requiring " the parties to fully

3    brief the issue of whether the discretionary function exception applies to the Public

4    Vessels Act and would require dismissal of this action independent of any ruling as to

5    reciprocity." *Id.* at 5.  On June 13, 2012, this Court issued an order holding,

> Plaintiffs failed to establish  subject matter jurisdiction under the Public
> Vessels Act because the discretionary function exception applies retaining
> sovereign immunity for the United States.  The Public Vessels Act is not
> a valid basis for subject matter jurisdiction because reciprocity does not
> exist with Ecuador which is a jurisdictional prerequisite to the waiver of
> sovereign immunity under the Public Vessels Act.

10   (ECF No. 100 at 11).

11        On July 12, 2012, Plaintiffs filed a notice of appeal from that Order.   On

12   September 25, 2013, the Court of Appeals for the Ninth Circuit issued an order

13   affirming in part, vacating in part, and remanding. *Tobar v. U.S.*, 731 F.3d 938 (2013)

14   ("*Tobar II*").  As to the issue of reciprocity, the Court of Appeals held,

> On the evidence submitted in this case, reciprocity with Ecuador exists
> because, in similar circumstances, nationals of the United States are able
> to sue Ecuador in Ecuadorian courts.  Accordingly, the government's
> waiver of sovereign immunity is not barred by the reciprocity
> requirement.

*Id.* at 949.  With regards to the discretionary function exception of the PVA, the Court

of Appeals stated,

> The statute authorizing the actions taken here speaks in pertinent part only
> in general terms and does not direct mandatory and specific action:
>
> > The Coast Guard *may* make inquiries, examinations,
> > inspections, searches, seizures, and arrests upon the high
> > seas and waters over which the United States has
> > jurisdiction, for the prevention, detection, and suppression of
> > violations of laws of the United States.  For such purposes,
> > commissioned, warrant, and petty officers *may at any time*
> > go on board of any vessel subject to the jurisdiction, or to the
> > operation of any law, of the United States, address inquiries

to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14 U.S.C. § 89(a) (emphases added).

Indeed, Plaintiffs do not assert that § 89(a) prescribes a specific course of action. Instead, they assert that the government violated its own regulations and policies. In particular, the U.S. Coast Guard Maritime Law Enforcement Manual provides: "When acting pursuant to flag State authorization, the boarding State may not exceed the terms of the authorization. Such authorization may be contained in a pre-existing written agreement or may be provided on an ad hoc basis." That policy does not afford any discretion: "the boarding State *may not exceed* the terms of the authorization." (Emphasis added.) Here, the specific authorization to board and inspect Plaintiffs' boat contained the following condition: "If there are no drugs on board, and there are damages or losses sustained by the vessel, in accordance to the U.S. laws and in a manner complying with international laws, the owner of the vessel will be compensated, as long as neither the vessel nor the crew have been involved in illicit actions." That directive, too, is specific and mandatory: The owner "*will be* compensated," so long as the specified conditions are met. (Emphasis added.) By carrying out its activities with respect to Plaintiffs' boat, the government accepted that mandatory obligation.

Accordingly, to the extent that Plaintiffs demonstrate that all of the specified conditions have been met, their claims are not barred by the discretionary function exception. In their complaint, Plaintiffs allege that there were no drugs on board, that there were damages and losses sustained by the vessel, that some Plaintiffs owned the boat, and that neither the vessel nor the crew had been involved in illicit actions. Because the district court dismissed this action on the pleadings, we take as true the allegations in the complaint. *Cell Therapeutics Inc. v. Lash Grp. Inc.*, 586 F.3d 1204, 1206 n. 2 (9th Cir. 2010). In this procedural posture, then, those elements have been satisfied.

It is less clear that Plaintiffs have exhausted their administrative remedies, as required by the policy: "in accordance to the U.S. laws and in a manner complying with international laws, the owner of the vessel will be compensated." The complaint alleges that Plaintiffs "filed a claim for injuries with the United States Navy and Coast Guard" and that the government took no action on that claim within six months, "tantamount to denial of the claim." At oral argument, the government's lawyer suggested that the administrative denial of Plaintiffs' claim resulted from Plaintiffs' failure to provide documentation of damages. In order to prove that the government violated its nondiscretionary duty to pay damages to the owner, Plaintiffs must demonstrate that it met the administrative

- 5 -

requirements imposed by federal law. But these issues cannot be decided on the pleadings.

Two additional, related restrictions warrant mention. First, the non-discretionary duty requires the government to pay damages to *"the owner"* of the boat. (Emphasis added.) Because the government's non-discretionary duty applies only to the owner of the boat, the only Plaintiffs who can benefit from the policy are the owners. Second, the nondiscretionary duty pertains to "damages or losses sustained by the vessel." Plaintiffs have alleged a wide range of injuries, including physical damages to the boat itself and reputational damages to crew members resulting from "public ridicule." Because the parties have not briefed the issue, we express no view on the extent of "damages or losses" encompassed by the non-discretionary duty to pay.

. . . . .

We therefore hold that, to the extent that Plaintiffs' claims fall outside the non-discretionary duty to pay damages, their claims are barred by the discretionary function exception.

*Id.* at 946-48 (footnotes omitted). The Court of Appeals remanded the case concluding,

[T]he government's waiver of sovereign immunity is not barred by the reciprocity requirement. The government's waiver of sovereign immunity also is not barred by the discretionary function exception to the extent that Plaintiffs' claims result from the failure of the government to meet its non-discretionary duty to pay damages, contained in Ecuador's authorization to board Plaintiffs' vessel and incorporated by reference in the Coast Guard Maritime Law Enforcement Manual. Otherwise, the discretionary function exception bars Plaintiffs' claims.

*Id.* at 949.

The Court set a bench trial in this matter for October 14, 2015. On September 24, 2015, Plaintiffs filed an Emergency Rule 37 and Rule 26(b) Motion or in the Alternative Plaintiffs' Motion for a Continuance. (ECF No. 207). Plaintiffs explained that on September 16, 2015 Plaintiffs "obtained a written agreement . . . between the governments of the United States and Ecuador which heretofore has not been produced by Defendant." (ECF No. 212 at 3). Plaintiffs attached a document titled "OPERATIONAL PROCEDURES FOR BOARDING AND INSPECTING VESSELS SUSPECTED OF ILLICIT TRAFFIC IN NARCOTIC DRUGS AND

PSYCHOTROPIC SUBSTANCES AND OF SMUGGLING MIGRANTS BY SEA" signed by Admiral Eduardo Navas Nájera and Rear Admiral Wayne Justice on August 20, 2006 ("the 2006 Agreement").

On October 8, 2015, the Court granted Plaintiffs' motion in part and denied it in part. (ECF No. 216). The Court ordered that the trial go forward as scheduled, on October 14, 2015, "as to all issues of liability as to all Plaintiffs." *Id.* at 2. The Court stated that, in the event that the Court found liability, "the Court will consider whether additional discovery and further hearing will be required in order to determine the proper award of damages." *Id.*

On October 14-16, 2015, the Court held the bench trial. (ECF No. 219, 220, 221). On October 30, 2015, the Court ordered the parties to appear on December 11, 2015 for an evidentiary hearing "with all necessary witnesses and exhibits" "to determine whether Defendant failed to comply with discovery obligations under Rule 26 and whether any additional undisclosed agreements existed prior to the 2006 Agreement." (ECF No. 228). On December 11, 2015, the Court held an evidentiary hearing. (ECF No. 232).

On January 8, 2016, Plaintiffs filed supplemental briefing in support of their emergency motion (ECF No. 236) and briefing regarding liability (ECF No. 237). On February 18, 2016, Defendant filed responses. (ECF Nos. 238, 239). On February 26, 2016, Plaintiffs filed replies. (ECF Nos. 240, 241).

On March 18, 2016, the Court held closing arguments on the liability. (ECF No. 243).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1  **II.    Findings of Fact and Conclusions of Law**

2      **A. Factual Background**

3      An Unclassified For Official Use Only document ("FOUO"), admitted at trial as

4  Plaintiffs' Exhibit 9[2], states that on or about October 4, 2005, the USS McCLUSKY,

5  a U.S. Navy frigate, located two Ecuadorian flagged fishing vessels, the F/V JOSTIN

6  and the F/V JOSE ANTONIO in international waters approximately 300 miles off the

7  Galapagos Islands. According to the Coast Guard Command Center Case Log ("Case

8  Log"), admitted as Plaintiffs' Exhibit 15, and the Coast Guard's Situational Report

9  ("Situational Report") created by Lieutenant Commander Torrey Bertheau, admitted

10 as Plaintiffs' Exhibit 4A and 4B[3], the vessels were located outside Ecuador's Exclusive

11 Economic Zone in an area not known for fishing. The Case Log states that the Marine

12 Patrol Aircraft sighted the JOSTIN "along JOSE ANTONIO." (Ex. 15 at 3).

13     A Department of Homeland Security information report, admitted as Plaintiffs'

14 Exhibit 10, states that on October 4, 2005, a United States Coast Guard Law

15 Enforcement Detachment ("LEDET") embarked on the McCLUSKY boarded the JOSE

16 ANTONIO. The report states that the LEDET "located and tested white powdery

17 substance secreted in net floats, using narcotics identification kit, which tested positive

18 for a controlled substance." *Id.* The report states that the LEDET "discovered two half

19 kilo-sized bricks of contraband hidden/secreted inside the net floats, which tested

20 positive twice using the Becton Narcotics Identification Test Kit, for a controlled

21

22     [2]  Plaintiffs offered documents into evidence without objection by the United
States. These documents were Exhibits 2, 3, 4, 7, 8, 9, 10, 15, 16, 17, 22, and 32. (ECF
23 No. 229 at 12:14 - 13:1-6.) All of these Exhibits were admitted at the first day of trial
by stipulation and without restriction. *Id.* at 13:5-6. "Unobjected to hearsay is
24 admissible and of probative value in the district courts." *N.L.R.B. v. Int'l Union of
Operating Engineers, Local Union No. 12*, 413 F.2d 705, 707 (9th Cir. 1969); *see also*
25 *E.E.O.C. v. Harris Farms Inc.*, 274 F. App'x 511, 514 (9th Cir. 2008)(a party waives
"its right to object by stating before trial that it did not contest the admissibility of the
26 . . . evidence, and by failing to make specific objections at trial to the [other] evidence."

27     [3]  Plaintiffs' Exhibit 4 included two situational reports. At trial, the Court
modified Exhibit 4 to make it 4A and 4B. (ECF No. 230 at 300:14-21). The Court
28 admitted Exhibits 4A and 4B, and denied Defendant's motion to introduce Defendant's
Exhibit B which was identical to Plaintiffs' Exhibit 4A. *Id.* at 301:3-6.

1  substance." *Id.* The FOUO states that after conducting an extensive pier-side search
2  of the JOSE ANTONIO, the officers and crew of the McCLUSKY discovered
3  approximately 5,300 pounds of cocaine valued at $169 million dollars on the JOSE
4  ANTONIO. (Ex. 9).

5      On October 5, 2005, the McCLUSKY approached the JOSTIN, which was no
6  longer located near the JOSE ANTONIO. The Case Log states that the JOSTIN was
7  "sighted 3X with no fishing" and had multiple fuel containers onboard. (Ex. 15). The
8  Case Log states that the JOSTIN was towing five "pangas" (smaller boats), each with
9  "whip antennas." *Id.* When the McCLUSKY contacted the JOSTIN by radio, the
10  JOSTIN stated that the master of the ship's name was "Washington Luca Franco." (Ex.
11  I, Tr. 294: 3-5 (Bertheau)). The Situational Report states that the JOSTIN told the
12  McCLUSKY that it was carrying approximately 5,000 pounds of dorado fish and shark
13  onboard, which was "not consistent with [the] stated length of voyage." (Ex. 4A).
14  Lieutenant Commander Torrey Bertheau, the deployable team leader for the LEDET,
15  testified that based on the pangas in tow, "the amount of fish on board, and how long
16  they had been underway . . . and the location and the flag of the vessel," he
17  recommended that the Coast Guard "attempt to conduct a boarding on" the JOSTIN.
18  (Tr. 295: 14-25).

19      Based on Bertheau's recommendation to conduct a boarding of the JOSTIN,
20  Lieutenant Commander Lawrence K. Ellis, U.S. Coast Guard Attaché, wrote to Rear
21  Admiral Eduardo Navas Nájera asking for permission to board the JOSTIN. This
22  letter, dated October 5, 2005, admitted as Plaintiffs' Exhibit 2, contained the following
23  language ("the 2005 Agreement"):

24
25      [W]e would like for the Ecuadorian government to confirm or deny that
        the vessel "JOSTYN" is Ecuadorian. . . . If the vessel is Ecuadorian we
26      would request your permission to stop, board, and inspect the vessel for
        the presence of illegal drugs. If we find illegal drugs, we will ask the
27      government what it is you want to do with the vessel, the crew and the
        cargo. If there are no drugs on board, and there are damages or losses
28

- 9 -                                          07cv817-WQH-JLB

1    sustained by the vessel, in accordance to the U.S. laws and in a manner
2    complying with international laws, the owner of the vessel will be
     compensated, as long as neither the vessel nor the crew have been
3    involved in illicit actions.

4   (Ex. 2).    The Case Log indicates that the Ecuadorian government granted the

5   McCLUSKY permission to board and search the JOSTIN. (Ex. 15 at 2).    In her

6   deposition, admitted as Plaintiffs' Exhibit 28, Plaintiff Rosa Zambrano Lucas, one of

7   the boat owners, testified that she gave permission for the boarding of the JOSTIN

8   prior to the Coast Guard barding the ship. (Ex. 28, 28:16-30:12).

9       On October 6, 2005, the LEDET from the McCLUSKY, lead by Lieutenant

10  Commander Bertheau, boarded the JOSTIN.    Once onboard, Plaintiff Joffre Cedeno

11  told the LEDET that he was the captain of the vessel,[4] and that he had been the captain

12  for approximately a year.[5]    The Situational Report  states that when LEDET asked

13  Cedeno and the vessel engineer about the location and number of fuel tanks onboard,

14  both "appeared unfamiliar with the [vessel] configuration, even though claimed to have

15  worked on [vessel] for one year." (Ex. 4A at 1).    Cedeno and the vessel engineer

16  claimed that there were four fuel tanks aboard the JOSTIN, which was the number

17  listed on the vessel's schematics.    Id.    The Situational Report states that, upon

18  inspection, the LEDET identified six tanks, two of which were not on the ship's

19  drawings. Id. Confronted with that information, Cedeno then "changed his story" and

20  stated that there were six tanks onboard.    Id.    The Situational Report states that the

21  amount of fish on the boat was inconsistent with the stated length of the voyage and

22  that the JOSTIN was well outside of the Ecuadorian Exclusive Economic Zone.    Id.

23      A Drug Enforcement Administration ("DEA") report ("DEA Report") created

24

25      [4] Washington Luca Franco is not a plaintiff in this action.

26      [5] Plaintiff Cedeno testified that at the time of the 2005 boarding he had only
27  worked on board the JOSTIN for six months and only worked one trip after the
    boarding. (Ex. 26, 66:6-19).  However, Plaintiff Rosa Zambrano Lucas, one of the
28  ship's owners, testified that she had hired Plaintiff Cedeno in 2000 and that he still
    worked for her full time as of July, 2014. (Ex. 28, 23:20-24:23).

1  by DEA Agent Gerard Dauphinais, admitted as Plaintiffs' Exhibit 8, states that Cedeno

2  did not know the type of engine nor the horsepower used to power the JOSTIN. (Ex.

3  8 at 2). The DEA Report states that Cedeno told the LEDET that the JOSTIN was a

4  fishing vessel and that it had been out at sea for approximately 20 days. *Id.* The DEA

5  Report states that Cedeno stated that his crew used a machete to behead its catch prior

6  to taking it to the cooler below deck. *Id.* Upon inspection of the fish hold, the LEDET

7  observed that there were approximately half the amount of fish that Cedeno had stated,

8  all of the fish were intact, the machete was dulled and rusted, and there was not enough

9  ice to keep the fish cold. (Exs. 4A, 8, 15).

10      During a limited search of the JOSTIN at sea, the LEDET conducted a non-

11  intrusive inspection of a fuel tank using a boroscope. The Situational Report states that

12  after inserting the scope approximately six to eight inches into the fuel, the scope's

13  view and movement were blocked by a bright blue obstruction. (Ex. 4A at 2). The

14  DEA Report states that based on the prior intelligence and the discovery of the extra

15  fuel tanks, the LEDET determined that the JOSTIN warranted a thorough anti-narcotics

16  inspection. (Ex. 8). The DEA Report states that the LEDET concluded that for safety

17  reasons, a 100% space accountability inspection of the JOSTIN could not be done at

18  sea and could only be done at a pier-side location. *Id.*

19      A letter dated October 6, 2005, admitted as Plaintiffs' Exhibit 3, states that

20  Lieutenant Commander Lawrence K. Ellis requested permission from Rear Admiral

21  Eduardo Navas Nájera to escort the JOSTIN together with the JOSE ANTONIO to

22  Puerto Bolivar. (Ex. 3). Plaintiffs' witness, Ecuadorian Naval Captain Carlos Rivera

23  testified that the procedure "was that the US vessel would escort the suspicious vessel

24  to a certain point where an Ecuadorian Coast Guard would be in charge and escort it

25  to the dock." (Tr. 109: 8-11). An Ecuadorian Chain of Custody Transfer document

26  signed by Rear Admiral Eduardo Navas Najera and Captain Bolivar Sanchez Soñudo,

27  admitted as Defendant's Exhibit O, suggests that the Coast Guard deliver the JOSTIN

28

1  and the JOSE ANTONIO to a rendezvous location about 20 nautical miles off Puerto

2  Bolivar. (Ex. O at 2).

3      Lieutenant Bertheau testified at trial that on October13, 2005 the JOSTIN and

4  its crew members were transferred to Captain Erik Benitez, of the Ecuadorian police,

5  and that he saw Captain Benitez sign the transfer document, DD Form 1149. (Tr 306).

6  The transfer document, DD Form 1149, admitted as Defendant's Exhibit A, signed by

7  Captain Benitez indicates that the JOSTIN and the crew of the JOSTIN were

8  transferred to the Ecuadorian police on October 13, 2005. (Ex. A). The Case Log also

9  states,

10

11      On 13OCT05 MCC rendezvoused with two EC Navy Patrol Boats, DEA,
    EC Police and additional LEDET personnel . . . . EC police took custody of F/V

12  JOSTIN and all crew members. Additional LEDET members and DEA embarked F/V
    JOSTIN for face to face passdown with LEDET 102 Boarding Officer. LEDET 102

13  BT returned to MCC after pass down complete. LEDET and DEA remained onboard
    for escort and to conduct dockside boarding. EC navy patrol boat escorted F/V

14  JOSTIN into port for joint agency dockside boarding.

15  (Ex. 15 at 5). At trial, Plaintiffs' witness, DEA Agent Dauphinais, testified that he

16  boarded the JOSTIN on October 13, 2005 and that he was the only DEA agent onboard.

17  (Tr 263). DEA Agent Dauphinais testified that he did not conduct a search of the

18  JOSTIN or the crew on behalf of the DEA. (Tr. 262: 14-20; 264: 8-13). DEA Agent

19  Dauphinais testified that there was no point in time that the DEA took custody of the

20  vessel. (Tr 263: 18-22). DEA Agent Dauphinais testified that if anyone had custody

21  of the vessel or the crew, it would have been some agency of the Ecuadorian

22  government. *Id*. at 263: 23-25.

23      The DEA report states,

24

25      Once in Machala, the Ecuadorian National Police began to conduct a
    search of the JOSTIN. All six of the tanks aboard the JOSTIN were

26  drained and checked with negative results. Although a thorough
    inspection of the entire vessel was negative, the search team found

27  approximately 25 empty 10-gallon plastic gas cans inside the forward P-
    tank compartment of the vessel. In addition, there were four 55-gallon

28

plastic drums filled with gasoline on the rear deck just in front of the fish cooler.

(Ex. 8 at 3). The DEA Report states that during the search, the Ecuadorian National Police inspected Cedeno's cellular telephone. *Id.* at 4. Although outgoing messages could not be read, there were two incoming messages that "were particularly interesting." *Id.* In one of them, the sender wrote, "Please tell him that they do not have anything to worry about." *Id.* A second incoming message received shortly thereafter stated, "Good, you worked fast." *Id.* The Situational Report states,

> shortly after completing the search, the [Source of Information] reported that he/she received information that the JOSTIN had successfully delivered approximately 1.5 tons of cocaine at sea prior to the [Coast Guard's] interdiction of the vessel. The [Source of Information] stated that the JOSTIN delivered the cocaine to an unknown location in the Pacific Ocean utilizing three buoys (believed to be radio direction buoy devices). The [Source of Information] did not have any information as to exactly when the cocaine was delivered nor who or what vessel may have retrieved the cocaine.

*Id.*

Lieutenant Commander Torrey Bertheau testified that his boarding team did not cause any physical damage to the JOSTIN prior to transferring the JOSTIN to Captain Eric Benitez of the Ecuadorian police. *Id.* at 307: 4-11. DEA Agent Dauphinais testified that he did not see any damage done to the JOSTIN, and that he did not cause any damage to the JOSTIN. (Tr. 256, 262-63). A naval message dated October 24, 2005, Plaintiffs' Exhibit 7 which was admitted at trial, states that on or about October 15, 2005, the JOSTIN was released and sailed out under her own power.

**B. Plaintiffs' Emergency Rule 37 and Rule 26(b) Motion**

On December 11, 2015, the Court held an evidentiary hearing "to determine whether Defendant failed to comply with discovery obligations under Rule 26 and whether any additional undisclosed agreements existed prior to the 2006 Agreement." (ECF No. 228). The Court had ordered the parties to appear "with all necessary witnesses and exhibits." *Id.*

1    At the hearing, the 2006 Agreement, a document titled "OPERATIONAL
2  PROCEDURES FOR BOARDING AND INSPECTING VESSELS SUSPECTED OF
3  ILLICIT TRAFFIC IN NARCOTIC DRUGS AND PSYCHOTROPIC SUBSTANCES
4  AND OF SMUGGLING MIGRANTS BY SEA" signed by Admiral Eduardo Navas
5  Nájera and Rear Admiral Wayne Justice, previously admitted at trial as Plaintiffs'
6  Exhibit 33, was admitted into evidence. (Ex. 33; ECF No. 230--Tr. 379:1-21). The
7  2006 Agreement was signed by both parties on August 30, 2006, more than ten months
8  after the boarding of the JOSTIN on October 5, 2005. (Ex. 33). Plaintiff did not
9  produce any other witnesses or documents.

10    Defendant called Brad Kieserman who testified that he had worked in the Coast
11  Guard Office of Maritime and International Law from 2000-2001. (ECF No. 242 at
12  7:17-21). Kieserman then worked as the legal advisor to the chief of law enforcement
13  from 2001 until "probably 2004 or 5." *Id.* Kieserman testified that after that he
14  "became the person in charge of the office." *Id.* Kieserman testified that the office
15  where he worked beginning in 2001 "ran the national level program for maritime law
16  enforcement interdiction operations generally and drug interdiction specifically." *Id.*
17  at 8:5-7. Kieserman testified that he became "chief of operational law" in 2005 or
18  2006. *Id.* at 8:9-16. Kieserman testified that while he worked at that office, he had
19  three basic roles,

20
21         One was providing real-time legal advice for ongoing Coast Guard
           operational missions, specifically law enforcement. I was also responsible
22         for international and domestic engagement for legal matters related to the
           mission set, and then I also negotiated international agreements and
23         arrangement pertinent to all maritime interdiction activities in which the
           Coast Guard was involved in.
24
25  *Id.* at 9: 2-9. Kieserman testified that he was "personally aware of the arrangements
26  and agreements between the United States and Ecuador on maritime interdiction
27  matters, and there were no agreements in place bilaterally or arrangements bilaterally
28  during August of 2005 or any time previous to that." *Id.* at 13:10-18. Kieserman

- 14 -                                    07cv817-WQH-JLB

1  testified that he drafted the 2005 Agreement, admitted at trial as Plaintiffs' Exhibit 2,

2  as an ad hoc agreement for use in multiple boardings that the United States requested

3  the Ecuadorian authorities to authorize. *Id.* at 18:2-22. Kieserman testified that he was

4  "not aware of any other forms or documents that were used to—to negotiate any

5  portion of the Jostin boarding other than this [2005] letter, and there were no forms in

6  effect at that time that were being used between the Ecuadorian Navy and the Coast

7  Guard." *Id.* at 19:13-17.

8        When asked about the revision date, "REV: 07/09/2006," at the top right corner

9  of the 2006 Agreement, Kieserman testified that the United States "began the use of

10  forms with Columbia in the early 2000s, as a way of expediting this process." *Id.* at 23:

11  20-28. Kieserman further testified that the 2006 Agreement used with Ecuador was an

12  "evolution" of the same forms used in other countries. *Id.* at 23:14-24:16. Kieserman

13  testified that until the 2006 Agreement was signed by Admiral Navas, "those forms

14  could not be used." *Id.* at 26: 19-27:4. Kieserman testified that the 2006 Agreement

15  "was the first opportunity I had to inform my team and the US interagency that the

16  operational procedures with Ecuador and all of its form processes were in effect, and

17  in fact, we used them about 15 minutes after the document was signed because we

18  found a vessel at sea and began using them immediately on August 30th." *Id.* at 26:3-

19  8.

20        Based on the evidence presented at the evidentiary hearing, the Court finds that

21  the 2006 Agreement went into effect after it was signed by Admiral Eduardo Navas

22  Nájera and Rear Admiral Wayne Justice on August 30, 2006. The Court finds that

23  there were no prior versions of the 2006 Agreements in effect with Ecuador prior to

24  August 30, 2006. The Court finds that the only agreement in effect when the JOSTIN

25  was boarded on October 5, 2005 was the 2005 Agreement, which was the letter signed

26  by Lieutenant Commander Ellis that was addressed to Rear Admiral Navas. (Ex. 2).

27  Plaintiffs' emergency motion for additional discovery is denied.

28

## C. Public Vessels Act

The United States, as a sovereign, is immune from suit. *United States v. Mitchell,* 445 U.S. 535, 538 (1980). A federal district court only has subject matter jurisdiction over a suit against the United States when sovereign immunity has been waived. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 435 (1989). The Public Vessels Act ("PVA") waives sovereign immunity for suits for "damages caused by a public vessel of the United States," 46 U.S.C. § 31102(a)(1), with the following reciprocity requirement,

> A national of a foreign country may not maintain a civil action under this chapter unless it appears to the satisfaction of the court in which the action is brought that the government of that country, in similar circumstances, allows nationals of the United States to sue in its courts.

46 U.S.C. § 31111. In *Tobar II,* the Court of Appeals found that "[t]he government's waiver of sovereign immunity is not barred by the reciprocity requirement" in the PVA. 731 F.3d at 949. The Court of Appeals also found that "[t]he government's wavier of sovereign immunity also is not barred by the discretionary function[6] exception to the extent that Plaintiffs' claims result from the failure of the government to meet its non-discretionary duty to pay damages, contained in Ecuador's authorization to board Plaintiffs' vessel [the 2005 Agreement] and incorporated by reference in the Coast Guard Maritime Law Enforcement Manual." *Id.* The Court of Appeals emphasized that the "non-discretionary duty requires the government to pay damages to '*the owner*' of the boat" for any "damages or losses sustained by the vessel." *Id.* at 947. The Court

---

[6] The Public Vessels Act ("PVA") does not contain a discretionary function exception. However, the Court of Appeals for the Ninth Circuit found that the discretionary function exception applies to the PVA. *Tobar II,* 731 F.3d at 945; *see also Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 254 (1st Cir. 2003) (concluding that the discretionary function exception applies to claims under the PVA); *B & F Trawlers, Inc. v. United States,* 841 F.2d 626, 630 (5th Cir. 1988) (same); *U.S. Fire Ins. Co. v. United States,* 806 F.2d 1529, 1534–35 (11th Cir. 1986), *abrogated in part by United States v. Gaubert,* 499 U.S. 315 (1991), *as recognized in Cranford v. United States,* 466 F.3d 955, 959 (11th Cir. 2006) (same).

1   of Appeals held that "[t]he challenged actions—the boarding, searching and towing of

2   the ship . . . are entitled to the protection of the discretionary function exception." *Id.*

3   at 948.

4       The 2005 Agreement is a letter between a United States Coast Guard officer,

5   Lieutenant Commander Lawrence K. Ellis, U.S. Coast Guard Attaché, and the

6   Ecuadorian Government official, Rear Admiral Eduardo Navas Nájera.  The 2005

7   Agreement is not an agreement between the United States and Plaintiffs.  Assuming

8   that the U.S. Coast Guard or an individual member of the U.S. Coast Guard had the

9   requisite authority necessary to formally bind the United States, creating a judicially

10   enforceable private right of action cognizable in federal courts[7], the Court considers

11   whether Plaintiffs "exhausted their administrative remedies, as required by the policy."[8]

12   *See Tobar II*, 731 F.3d at 947.

13       The Complaint alleges that Plaintiffs "filed a claim for injuries with the United

14   States Navy and Coast Guard" and that the government took no action on that claim

15   within six months, "tantamount to denial of the claim." (ECF No. 28 at 5).  A letter

16   from G.D. Owen, Chief, Claims and Litigation Branch of the United States Department

17   of Homeland Security, dated September 1, 2006, admitted at trial as Defendant's

18

19       [7] At the evidentiary hearing on December 11, 2015, Brad Kieserman, former

20   chief of the office that ran the national level program for maritime law enforcement
interdiction operations in 2005 or 2006, stated,

21       The position of the US Government at that time and until the time I left the Coast
Guard was that claims would – claims would be cognizable under the

22       Military Claims Act.  There was no litigation anticipation with this, and
we had a very clear strategy of trying to get anything like that dismissed

23       because we didn't view it as a cause of action, so this was about
providing what I will call an equitable remedy or a political remedy

24       through the Military Claims Act should there have been damage to
vessels.

25   (ECF No. 242 at 30:24-31:7).

26       [8] Plaintiffs may have had recourse to recover damages through the Military

27   Claims Act, 10 U.S.C. §§ 2731-2738,which provides an administrative remedy from
damages claimed by inhabitants of foreign countries, caused by non-combat activities

28   of the United States military.

1    Exhibit Q., states,

2       Dear Mr. Boyaki:

3
4       Regarding your letter of August 21, 2006, the 26 individual claims you submitted for alleged damages that occurred on October 5, 2005, have been received by this office.

5
6
7
8       At this time I am unable to evaluate these claims because no evidence was presented to support the amounts claimed for property damages/loss or personal injury. I direct your attention to 33 C.F.R. § 25.115 - § 25.119 if you are unsure of the nature of evidence that must be submitted for these claims to be considered.

9
10
11       This is not a denial. Should this information be received, we shall proceed with consideration of these claims. Finally, this letter should in no way be interpreted as waiving any rights of the United States or other legal requirements including any applicable statute of limitations.

12 A letter from Plaintiffs' counsel to G.D. Owen, dated October 5, 2006, admitted as

13 Defendant's Exhibit states,

14       Dear Mr. Owen:

15
16         It appears from your last letter that you have no information in this case.

17
18
19         As such, I will file it in Galveston, Texas next month. It might be helpful if we knew; 1) why the personnel of the U.S.S. McClusky boarded and seized our ship; and 2) is it more convenient to file this case in California or Texas?

20
21         For your information, attached is a letter from the Coast Guard through the U.S. Embassy offering to pay damages.

22
23         It would seem to me that the way to handle this claim is to provide the claimants with some necessary information and let us respond. But then again, what do I know about claims?

24
25
26         Send your empty file and your nonexistent litigation report to Houston. The U.S. Attorney will be like me and have to start from scratch.

27 (Def's Ex. R). Assuming that Plaintiffs "exhausted their administrative remedies, as

28 required by the policy," this Court held a trial to determine whether the government

1  had a non-discretionary "duty to pay damages" to "the owner" of the JOSTIN for any
2  "damages or losses sustained by the vessel" under the 2005 Agreement. *See Tobar II*,
3  731 F.3d at 947.

4      The 2005 Agreement contained the following conditions: "If there are no drugs
5  on board, and there are damages or losses sustained by the vessel, in accordance to the
6  U.S. laws and in a manner complying with international laws, the owner of the vessel
7  will be compensated, as long as neither the vessel nor the crew have been involved in
8  illicit actions." (Ex. 2).  Plaintiffs must establish by a preponderance of the evidence
9  that "there are damages or losses sustained by the vessel" and that "neither the vessel
10  nor the crew have been involved in illicit actions."  "[T]o the extent that Plaintiffs
11  demonstrate that all of the specified conditions have been met, their claims are not
12  barred by the discretionary function exception." *Tobar II*, 731 F.3d at 947.

13      **I. Damages or Losses Sustained by the Vessel**

14      At trial, Defendant's witness Lieutenant Commander Torrey Bertheau credibly
15  testified that he helped execute the custodial transfer of the JOSTIN from the Coast
16  Guard to the Ecuadorian authorities on October 13, 2005. Bertheau credibly testified
17  that in preparation for the transfer of custody he completed the Transfer Form, met in
18  person with Captain Eric Benitez of the Ecuadorian police, and witnessed Captain
19  Benitez sign the Transfer Form.  Plaintiffs' witness DEA Agent Gerard Dauphinais
20  credibly testified that there was no point in time that the DEA took custody of the
21  JOSTIN and that he never conducted a search of the JOSTIN.  Both Bertheau and
22  Dauphinais credibly testified that they did not cause or see any damage to the boat.
23  Dauphinais also testified that he did not see the Ecuadorian National Police do any
24  physical damage to the vessel while she was at sea or at the pier in Puerto Bolivar.  A
25  naval message dated October 24, 2005, Plaintiffs' Exhibit 7, stated that on or about
26  October 15, 2005, the JOSTIN was released and sailed out under her own power.  The
27  Court concludes that on October 13, 2005, the custody of the JOSTIN was transferred
28

from the Coast Guard to the Ecuadorian National Police. The Court concludes that Plaintiffs did not establish by a preponderance of the evidence that the JOSTIN sustained any damages or losses while it was in the custody of the Coast Guard.

### ii. Illicit Actions

The United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (1988) defines "illicit traffic" as committing any of the offenses listed in Article 3 of the Convention. 28 I.L.M. 493, 499 (1989). Article 3 offenses include any action engaging in the possession, manufacture, distribution, transit, import, export or trade in prohibited substances, as well as any activity "aiding, abetting, facilitating and counseling the commission of any of the offences established in accordance with this article." *Id.* at 501.

At trial, sufficient evidence was presented, primarily through the admission of Plaintiffs' exhibits, regarding the JOSTIN's involvement in illicit actions. The JOSTIN was seen located along the JOSE ANTONIO in waters not known for finishing and outside of Ecuador's Exclusive Economic Zone. The Coast Guard discovered cocaine on the JOSE ANTONIO before the Coast Guard boarded the JOSTIN, and after a pier-side search, the JOSE ANTONIO was found to have 5,300 pounds of cocaine onboard. The JOSTIN wrongly reporting to the McCLUSKY that Washington Luca Franco was the captain of the vessel. The JOSTIN had an amount of fish on the boat that was inconsistent with the stated length of the voyage and the amount initially reported by the JOSTIN to the McCLUSKY. There was insufficient ice in the cooler on the JOSTIN to keep the fish cold. The fish were intact and the machete, which was supposed to behead the fish, was rusted and dulled. The ship captain, Cedeno, and the vessel engineer were unfamiliar with how many fuel tanks were located onboard the JOSTIN. There were two fuel tanks present on the ship that were not on the ships schematics and, initially, not reported by Cedeno or the vessel engineer. There were five pangas with long range radio antennas attached to the JOSTIN. Upon a pier-side

1  search, suspicious text message correspondence was located on Cedeno's cellular
2  phone. There was subsequent information alleging that the JOSTIN had successfully
3  delivered approximately 1.5 tons of cocaine at sea prior to being boarded by the Coast
4  Guard. The Court concludes that Plaintiffs did not establish by a preponderance of the
5  evidence that the JOSTIN and its crew were not involved in illicit actions. In addition,
6  the evidence strongly infers that the JOSTIN and its crew were involved in illicit
7  actions.

8  **III. Conclusion**

9       IT IS HEREBY ORDERED that Plaintiffs' Emergency Rule 37 and Rule 26(b)
10  Motion or in the Alternative Plaintiffs' Motion for a Continuance is denied.

11       IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in
12  favor of Defendant and against Plaintiffs as to all claims in the Complaint.

16  DATED: _____4/1/16_____

**WILLIAM Q. HAYES**
United States District Judge

07cv817-WQH-JLB